UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David Gantman,                                                          Civil No. 24-1195 (DWF/JFD)

          Plaintiff,

v.                                                                                    MEMORANDUM
                                                                                  OPINION AND ORDER
Afshin "Alex" Farahan,

          Defendant.

## INTRODUCTION

This matter is before the Court on Defendant Afshin "Alex" Farahan's motion to dismiss. (Doc. No. 3.) Plaintiff David Gantman opposes the motion. (Doc. No. 9.) For the reasons set forth below, the Court grants the motion.

## BACKGROUND

Gantman was an insurance salesman who dabbled in trading stocks. (Doc. No. 1-1 ("Compl.") ¶¶ 3, 5.) Over the years, Gantman invested millions of dollars in the stock market. (*Id.* ¶ 5.) Gantman was friends with Farahan, and, from time to time, they discussed the stock market. (*Id.* ¶ 9.)

Farahan lived out of state but frequently visited Minnesota for business. (*Id.* ¶¶ 6-7.) In August 2018, Farahan visited Minnesota and stayed with his friend, Doron Tavlin. (*Id.* ¶ 20.) Tavlin was the Vice President of Business Development at Mazor Robotics Ltd., an Israeli medical device company that specializes in robotic-surgery devices. (*Id.* ¶¶ 14, 20.) During Farahan's stay, Tavlin told Farahan that Medtronic was

likely going to acquire Mazor and purchase its stock at a premium. (*Id.* ¶¶ 21-23.) Relying on that information, Farahan quickly purchased around $1,000,000 of Mazor stock. (*Id.* ¶ 27.)

Later that month, Farahan had a discussion with Gantman about Mazor. (*Id.* ¶ 30.) Gantman alleges that Farahan mentioned to him only that Mazor was a "good buy." (*Id.*) Through his own research, Gantman concluded that Mazor was undervalued and expected the price of Mazor stock to "rise significantly in response to the announcement of a new product" that Mazor and Medtronic were planning to debut at the end of September. (*Id.* ¶¶ 31-32.) Gantman proceeded to purchase hundreds of thousands of dollars of Mazor stock and options. (*Id.* ¶¶ 33-34.)

In January 2021, the FBI contacted Gantman and Farahan about their purchases of Mazor securities in 2018. (*Id.* ¶ 40.) Farahan immediately retained in attorney. (*Id.* ¶ 57.) After retaining an attorney, Farahan "negotiated a proffer session with the FBI, the SEC, and the [U.S.] Attorney's [O]ffice for the District of Minnesota." (*Id.* ¶ 58.) During the proffer session in May 2021, Farahan admitted that he received a "tip" from Tavlin "about a potential buyout of Mazor by Medtronic." (*Id.* ¶¶ 60-61.) Farahan further admitted that he purchased securities based on that tip. (*Id.* ¶ 61.)

In addition, Farahan told the FBI that he shared with Gantman that Mazor was going to be acquired by Medtronic and mentioned that he learned about that "tip" from Tavlin, who was an insider at Mazor. (*Id.* ¶ 65.) Gantman asserts that this was not true and that Farahan lied to "mitigate the consequences of his criminal conduct, with the goal

of getting the most lenient possible sentence." (*Id.* ¶¶ 66, 83.)  In a second proffer interview in September 2021, Farahan repeated the same statements. (*Id.* ¶ 84.)

Gantman was later charged with securities fraud and conspiracy to commit securities fraud and lost his job. (*Id.* ¶¶ 98-99.)  Moreover, numerous news outlets reported on the criminal case, further damaging Gantman's reputation. (*Id.* ¶ 104.)

Gantman alleges that prior to Gantman and Tavlin's trial in February 2024, Farahan again repeated the same false statements to the FBI. (*Id.* ¶¶ 107, 109.)  In addition, Farahan testified against Gantman and Tavlin during their trial. (*Id.* ¶ 110.)  Following the trial, Gantman was acquitted. (*Id.* ¶ 113.)

Gantman brought this action against Farahan, asserting claims of defamation and tortious interference.  Farahan now moves to dismiss the action.

## DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual

allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

Farahan argues that the defamation claim should be dismissed because the statements he made during the proffer sessions to the FBI, the SEC, and the U.S. Attorney's Office are subject to absolute privilege. "Statements, even if defamatory, may be protected by absolute privilege in a defamation lawsuit." *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306 (Minn. 2007). Absolute privilege provides immunity "even for intentionally false statements, coupled with malice." *Matthis v. Kennedy*, 67 N.W.2d 413, 416 (Minn. 1954). For that reason, "the absolute privilege rule is confined within narrow limits" and applies only "to situations in which the public service or the administration of justice requires complete immunity from being called to account for language used." *Id.* at 417.

Minnesota applies absolute immunity to statements made by a judge, attorney, or witness during a judicial or quasi-judicial proceeding if the statements relate to the subject matter of the litigation. *Mahoney*, 729 N.W.2d at 306. The absolute privilege also "extends to statements published prior to the judicial proceeding" so long as the statements "have some relation to the judicial proceeding." *Id.* This includes statements made by "[a] party to a private litigation or a private prosecutor or defendant in a criminal prosecution." Restatement (Second) Torts § 587; *see Matthis*, 67 N.W.2d at 419 (citing to the Restatement (First) Torts § 587). For communications prior to a judicial proceeding, the communication must have "some relation to a proceeding that is

contemplated in good faith and under serious consideration." Restatement (Second) Torts § 587, cmt. e.

Minnesota courts have declined to extend the absolute privilege to individuals who make "a good faith report of suspected criminal activity to law enforcement officials." *Smits v. Wal-Mart Stores, Inc.*, 525 N.W.2d 554, 557 (Minn. Ct. App. 1994). Rather, the courts have instead applied a qualified privilege in those situations. *Id.* A qualified privilege "grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice." *Matthis*, 67 N.W.2d at 416. Courts have applied a qualified privilege to these situations because they have found that these reports "serve the public interest, despite the risk that some reports might be defamatory." *Smits*, 525 N.W.2d at 557.

Gantman argues that the Court should apply the qualified privilege to the statements Farahan made during the proffer sessions because Farahan was essentially reporting a crime. Gantman compares this case to *Aromashodu v. Swarovski North America Limited*, 981 N.W.2d 791, 794 (Minn. Ct. App. 2022), where a manager of a jewelry store informed airport police that a customer stole earrings. When the customer sued the manger for defamation, the court applied qualified privilege. *Id.* at 799. Similarly, in *Smits*, a Wal-Mart employee called 911 to report that a customer had shoplifted a camera. *Smits*, 525 N.W.2d at 556. When the customer sued for defamation, the court again applied qualified privilege. *Id.* at 557. Qualified privilege also applied to a report by a hotel worker of criminal activity and report by an office manager of a stolen prescription pad. *Mukherjee v. Vipperman*, No. A17-1482, 2018 WL 3213047, at *1-4

5

(Minn. Ct. App. July 2, 2018); *Desmonde v. Nystrom & Assocs.*, No. A09-0221, 2009 WL 2596059, at *1-4 (Minn. Ct. App. Aug. 25, 2009).

In the cases Gantman has cited where a person contacts law enforcement to report a crime, those communications clearly do not have "some relation to a proceeding that is contemplated in good faith and under serious consideration." Restatement (Second) Torts § 587 cmt. e. In those situations, the person making the report is not a defendant in a criminal proceeding nor is the person contemplating criminal prosecution. Proffer sessions, on the other hand, differ in that they often are intertwined with criminal proceedings and, at times, are even considered part of plea negotiations.

Minnesota courts have not determined whether absolute or qualified immunity applies to proffer sessions. Proffer sessions are often negotiated and require a proffer agreement. "A 'proffer agreement' is generally understood to be an agreement between a defendant and the government in a criminal case that sets forth the terms under which the defendant will provide information to the government during an interview, commonly referred to as a 'proffer session.'" *United States v. Lopez*, 219 F.3d 343, 345 n.1 (4th Cir. 2000). A proffer session can be considered part of plea negotiations when the parties "perceive[] the discussion to be part of their efforts to dispose of the matter [] through extraction of information . . . and, possibly, a plea." *S.E.C. v. Johnson*, 534 F. Supp. 2d 63, 67 (D.D.C. 2008) (internal quotations and citation omitted); *see also United States v. Bloate*, 534 F.3d 893, 901-02 (8th Cir. 2008), *rev'd on other grounds*, 559 U.S. 196 (2010) (noting that plea negotiations may include proffer sessions).

6

In this case, Gantman alleges that the FBI contacted Farahan regarding his purchase of Mazor stock. (Compl. ¶ 40.) Farahan then "immediately retained a law firm to minimize his criminal exposure" and then "negotiated a proffer session with the FBI, the SEC, and the [U.S.] Attorney's [O]ffice." (*Id.* ¶¶ 57-58.) While the Court does not know the details of the proffer agreement, the Complaint acknowledges that the proffer sessions were "negotiated," meaning certain ground rules, or conditions, were agreed to prior to the proffer session. Gantman alleges that during these proffer sessions, Farahan confessed to securities fraud; namely, he admitted to receiving a "tip" from Tavlin and relying on that information to purchase securities. (*Id.* ¶ 61.) Farahan further admitted that he then shared this inside information with Gantman, who then purchased securities. (*Id.* ¶ 85.) Gantman alleges that Farahan negotiated these proffer sessions "to mitigate the consequences of [Farahan's] criminal conduct, with the goal of getting the most lenient possible sentence." (*Id.* ¶ 83.) In a separate paragraph of the Complaint, Gantman reiterates that Farahan made these statements in the proffer sessions to "secure the best possible recommendation from the government for a lenient sentence." (*Id.* ¶ 122.)

The facts in the Complaint clearly demonstrate that Farahan's statements during the proffer sessions were preliminary to a judicial proceeding in that the statements had "some relation to a proceeding that [wa]s contemplated in good faith and under serious consideration." *See* Restatement (Second) Torts § 587 cmt. e. Not only did Farahan anticipate criminal proceedings, but Farahan specifically arranged the proffer sessions "to secure the best possible recommendation from the government" and "with the goal of

7

getting the most lenient possible sentence." (Compl. ¶¶ 83, 122.) And during the proffer sessions, Farahan confessed to committing securities fraud. It is possible that these proffer sessions would be considered part of the plea negotiations, but the Court's decision today does not turn on that conclusion. It is clear from the Complaint that, at a minimum, Farahan negotiated the proffer sessions because he, in good faith, anticipated criminal proceedings against him and wanted to work out an agreement with the government whereby he would provide information in exchange for some sort of leniency in his criminal case.

      The Court also need not address whether absolute immunity applies to every single proffer session. As Gantman postulates, it may be possible for a person to participate in a proffer session for the sole purpose of reporting a crime, without contemplating criminal prosecution and for a purpose other than negotiating some sort of leniency or cooperation agreement. But the Court need not address these hypotheticals, because the Complaint here outlines the proffer sessions in detail. Farahan believed he was going to be criminally charged, retained an attorney, negotiated proffer sessions with the FBI, the SEC, and U.S. Attorney's Office, confessed to crimes during the proffer sessions, and did so "to mitigate the consequences of his criminal conduct, with the goal of getting the most lenient possible sentence." (Compl. ¶ 83.) There is no doubt, under these alleged facts, that Farahan negotiated these proffer sessions in good faith contemplation of a criminal proceeding against him that was under serious consideration. In these respects, the proffer sessions are akin to statements made in the civil context "in anticipation" of litigation, which courts have held are subject to absolute immunity.

*Pinto v. Int'l Set, Inc.*, 650 F. Supp. 306, 308-09 (D. Minn. 1986). The Complaint makes clear that Farahan was not merely reporting a crime, but rather negotiating the resolution of his own criminal culpability. The Court therefore concludes that the statements Farahan made during these proffer sessions are subject to absolute immunity.

Because Gantman's tortious interference claim stems from the defamation, this claim is also dismissed. *Mahoney*, 729 N.W.2d at 309 ("Absolute privilege also bars claims sounding in defamation—that is claims where the injury stemmed from and grew out of the defamation.").

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Farahan's motion to dismiss (Doc. No. [3]) is **GRANTED.**

2. Gantman's claims against Farahan are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 31, 2024                                s/Donovan W. Frank
                                                                                   DONOVAN W. FRANK
                                                                                   United States District Judge